UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION, | )<br>)<br>) |
| Plaintiff, | )<br>) |
| v. | ) Case No.<br>) |
| RONALD D. SWANSON, | ) JURY TRIAL DEMANDED<br>) |
| Defendant, | )<br>)<br>) |

## COMPLAINT

Plaintiff Securities and Exchange Commission ("the Commission") alleges the following against defendant Ronald D. Swanson ("Swanson" or "Defendant"), and hereby demands a jury trial:

## PRELIMINARY STATEMENT

1. From approximately October 2012 to approximately August 2015, defendant Swanson, then a resident of Connecticut, engaged in a fraudulent scheme to solicit more than $2 million from investors in Sonic Cavitation LLC ("SonCav) securities through material misrepresentations and omissions about the company's technology and financial prospects.

2. SonCav purportedly held exclusive distribution rights in the United States to a patented technology to purify liquids for a variety of potential applications, including in the oil and gas industry. Swanson served as SonCav's Chief Executive Officer and General Counsel. Swanson made three primary types of false and misleading claims to investors and prospective investors while raising investor funds for SonCav: false claims about potential business partners, false claims about the technology, and false claims about the securities investments themselves.

3. First, Swanson grossly exaggerated the level of interest that other companies, including a global publicly-traded energy company ("Energy Company A"), had expressed regarding SonCav's business and SonCav's touted liquid purification technology. As Swanson knew, and failed to tell investors, employees of Energy Company A had expressed extreme skepticism about the viability of SonCav's technology and had not expressed interest in investing in, or purchasing technology from SonCav. Nevertheless, Swanson told investors and prospective investors that Energy Company A planned to and would soon become both a major investor in and a major customer of SonCav, thereby giving those investors a false understanding of SonCav's business prospects. Swanson made similar misrepresentations about expressions of interest from a large oil and gas company ("Energy Company B"), including representing that interest from that company had been unsolicited. Swanson also falsely told investors and prospective investors that SonCav had partnered with another company, which had agreed to provide for free all the components SonCav needed to test its technology.

4. Second, Swanson falsely claimed to investors that a reputable research and development firm had independently verified the liquid purification technology that SonCav was trying to develop and market and the successful use of that technology in an earlier version of the machine in a practical setting in Russia. In fact, the firm's report (the "Institute Report") said exactly the opposite, concluding that the liquid purification technology had not worked in Russia as Swanson claimed. Moreover, while SonCav had built a single prototype of a machine that purportedly used the same technology as the Russian unit, SonCav's prototype had never been tested by any independent third party at all. Swanson repeatedly misrepresented the liquid purification technology's testing history, capabilities, and performance in real-life applications.

Swanson made these claims to investors and prospective investors, knowing that the claims were not supported by the Institute Report or any other independent source.

5. Third, Swanson lied to investors and prospective investors about the investment terms and the risk of the investment. He told at least one prospective investor that the principal of the investment was protected because it was secured by an investment in publicly-traded stock of another company. But Swanson knew that there was, in fact, virtually no protection provided by that stock when he made those misrepresentations, because the value of that stock would not begin to cover the amount of the investments. He also attracted prospective investors by telling them they could withdraw their money upon maturity, and later, when investors were making the decision whether to convert their investments to equity, Swanson misrepresented that there would be a simple and short redemption process. In actuality, there was no meaningful opportunity for investors to get their money back. When one investor tried, Swanson gave a variety of excuses and repeatedly changed the "rules" of that redemption process. And, at the same time Swanson was repeatedly telling that investor to jump through hoops to get his money back, Swanson paid back the investments and loans of family members.

6. Swanson made these false and misleading statements in connection with the offer, purchase, and sale of securities and obtained money for SonCav as a result of his statements. Swanson drafted and disseminated emails, business plans, and other documents containing false and misleading statements to investors and prospective investors, all of which successfully induced investors to provide convertible bridge loans to SonCav, convertible into equity interests in SonCav at the option of the investor at the maturity date, and/or successfully induced investors

3

to refrain from withdrawing the principal and interest from their existing convertible bridge loans upon maturity.

7.     Swanson's false and misleading statements were material to potential and actual investors in SonCav convertible bridge loans, as well as to those who converted their bridge loans into equity interests in SonCav.  Swanson's false and misleading statements gave investors the false sense that SonCav's economic prospects remained rosy and that its technology was proven to work.  Investors would reasonably have wanted to know, for example, that no one at Energy Company A had expressed interest in placing an order, or purchasing an interest in SonCav, and that Energy Company A's engineers had concluded that SonCav's technology, as described, would violate the laws of physics and thermodynamics.  Investors likewise would reasonably have wanted to know that neither SonCav's technology nor its practical application had been verified by any reputable, independent third-party, and that Swanson's representations about the contents of the Institute Report were flatly untrue.

8.     Swanson personally profited from his misrepresentations to investors by virtue of the fact that investor funds kept SonCav operating.  SonCav had no revenue, so Swanson's entire salary as well as both personal and business expenses were paid with investor funds.

9.     By engaging in the conduct described herein, Swanson violated Section 17(a) of the Securities Act of 1933 (the "Securities Act") and Section 10(b) of the Securities Exchange Act of 1934 ("Exchange Act") and Rule 10b-5 thereunder.  Based on these violations, the Commission seeks:  (1) entry of a permanent injunction prohibiting further violations of the relevant provisions of the federal securities laws; (2) disgorgement of ill-gotten gains within the five-year statute of limitations, plus pre-judgment interest; (3) the imposition of a civil monetary penalty; (4) an order prohibiting Swanson from acting as an officer or director of any issuer of

publicly-traded securities; and (5) such other and further relief as the Court deems just and proper.

## JURISDICTION AND VENUE

10. The Commission brings this action pursuant to the enforcement authority conferred upon it by Section 20(b) of the Securities Act [15 U.S.C. §77t(b)] and Section 21(d) of the Exchange Act [15 U.S.C. §§78u(d)].

11. This Court has jurisdiction over this action pursuant to Sections 20(b) and (d) and 22(a) and (c) of the Securities Act [15 U.S.C. §§ 77t(b), 77t(d), and 77v(a),77v(c)] and Sections 21(d), 21(e), and 27 of the Exchange Act [15 U.S.C. §§78u(d), 78u(e), and 78aa].

12. Venue is proper in this district pursuant to Section 22(a) of the Securities Act [15 U.S.C. §77v(a)] and Section 27 of the Exchange Act [15 U.S.C. §78aa], because certain of the transactions, acts, practices, and courses of business constituting the violations alleged herein occurred within the District of Connecticut.

13. In connection with the conduct alleged in this Complaint, Swanson directly or indirectly made use of the means or instruments of transportation or communication in interstate commerce, the facilities of a national securities exchange, or the mails.

14. Swanson's conduct involved fraud, deceit, or deliberate or reckless disregard of regulatory requirements, and resulted in substantial loss, or significant risk of substantial loss, to other persons.

15. Unless enjoined, Swanson will continue to engage in the securities law violations alleged herein, or in similar conduct that would violate the federal securities laws.

## DEFENDANT

16. **Swanson**, age 53, was a resident of Litchfield, Connecticut during the relevant period. At all times relevant to this Complaint, Swanson was the CEO and general counsel of

SonCav, and conducted business on behalf of SonCav from his home office in Connecticut until SonCav suspended him in or about August 2015. Swanson was licensed as an attorney in the District of Columbia from 1998 until he was disbarred by consent in November 2018. Swanson is currently CEO and principal of a new company he formed to focus on a liquid purification technology. He also serves as an officer for a number of affiliated entities. Swanson previously served as the General Counsel of a regional division of a publicly-traded major automobile finance company.

### RELEVANT ENTITIES

17. **Sonic Cavitation LLC** is a limited liability company organized in Nevada in October 2012 that, during the relevant period, had a principal place of business in Houston, Texas. SonCav purports to be a pre-revenue new technology start-up formed to launch a liquid purification technology with applications in various industries, including oil and gas, mining, beverage, and water treatment. SonCav held the U.S. distribution rights to the technology, which it licensed from Sonic Cavitation Ltd.

18. **Sonic Cavitation Ltd.** is a private foreign company organized in Dublin, Ireland in 2012 that is owned and controlled by foreign individuals and holds the global distribution rights to SonCav's technology. Sonic Cavitation Ltd. is the majority owner in SonCav.

### FACTS

19. Swanson served as CEO and general counsel of SonCav from October 2012 until his termination in August 2015. Swanson was purportedly responsible for the development and commercial launch of SonCav's liquid purification technology.

20. As CEO and general counsel, Swanson raised funds for SonCav's operations using convertible bridge loan agreements whereby SonCav unconditionally promised a high rate of interest upon maturity, unless the holder opted to convert to an equity interest in SonCav in

lieu of receiving interest and return of principal. The terms varied, but the majority of the notes matured in one year, with 120%-200% due back upon maturity, consisting of principal, plus interest. Many of the notes stated they were secured either by equipment or by shares of a small, publicly traded company that were owned and pledged by the inventor and patent holder of the liquid purification technology. Certain investors invested directly in SonCav, while earlier investors did so indirectly, by pooling their money into a limited liability company that Swanson had created for the sole purpose of investing in SonCav.

21. For much of the relevant period, Swanson was the only employee of SonCav, and there was little to no oversight over his management of the funds in SonCav's bank account, which was funded solely with investor money. In 2015, for a very brief time, Swanson employed a Chief Financial Officer (CFO). The CFO resigned from SonCav when Swanson failed to provide him with the financial records that he needed to perform his duties, prompting the principals of SonCav's parent to conduct an audit, which ultimately resulted in Swanson's termination.

22. Swanson also used the SonCav business account to make large payments to his personal credit card, which he purportedly used to cover SonCav business expenses when SonCav did not have sufficient funds. During this same period, SonCav failed to make payments to SonCav investors who were due principal and interest on their convertible bridge loans.

**Swanson's False and Misleading Statements to Investors**

23. From at least November 2013 through August 2015, Swanson made a variety of false and misleading representations and fraudulent omissions to solicit funds from actual or prospective investors, and/or to induce existing investors to forgo calling in their convertible bridge loans upon maturity and instead convert them to equity positions. During that period of time, on multiple occasions, Swanson solicited these investments by making false and

7

misleading statements and fraudulent omissions concerning (1) the level of interest that other companies had in SonCav's technology and business; (2) the viability of SonCav's technology; and (3) the terms and risk of their investment.

**Misrepresentations about Other Companies' Interest in SonCav**

24. Swanson repeatedly represented to numerous actual and prospective investors that SonCav had attracted the interest of large, publicly traded companies in SonCav's technology and business, including Energy Companies A and B, and a water technology company that would provide components to SonCav for free. For instance, Swanson told investors that Energy Company A wanted to acquire an equity interest in SonCav and/or had expressed an interest in placing a large volume order. Swanson made these statements despite his awareness that neither Energy Company A's Board of Directors, nor its upper management, knew anything about SonCav or its technology. And, Swanson knew that an engineer employed by Energy Company A (the "Engineer") who had evaluated SonCav's technology, had explicitly told Swanson that he did not believe SonCav's claims about the efficacy of its technology based on his experience and observations regarding the technology. In fact, the Engineer stated, in effect, that SonCav's purported technology likely violated the laws of thermodynamics. In short, Energy Company A never considered the technology commercially viable.

25. Swanson made these false and misleading statements about Energy Company A's interest in SonCav to solicit additional funds from new and existing investors. In particular, Swanson represented that SonCav urgently needed additional funds in order to continue to operate, and claimed that SonCav's continued operation was critical to its purported opportunity to bring a deal with Energy Company A to fruition. Swanson made these statements during a

8

time when existing investors were making decisions on whether to cash out their notes, or instead convert their investment to an equity interest in SonCav.

26. For example, multiple times in late 2013 and early 2014, Swanson told investors and prospective investors that Energy Company A was in discussions with SonCav to place an order for over 500 units at $400,000 per unit (i.e., a $200 million order). This was false. Neither Swanson nor his associate—a middleman whom Swanson had engaged to introduce SonCav's technology to Energy Company A—were engaged in discussions about a 500-unit order or any other significantly sized order.

27. Similarly, multiple times in late 2013 and early 2014, Swanson falsely represented to investors that Energy Company A would soon make SonCav an offer for a 10%-12% equity stake in SonCav. Again, this statement by Swanson was untrue; no such discussions had taken place with Energy Company A.

28. In fact, as early as June 2013, Swanson's middleman with Energy Company A had advised Swanson that his contact within Energy Company A was at the staff level, and that his contact did not intend to brief higher ups within Energy Company A about SonCav's technology unless and until SonCav provided proof that the technology worked.

29. As Swanson wrote in a March 10, 2014 email to his cousin, who was also a SonCav investor:

> One of the guys … when we met at their office, interrupted [the inventor of the SonCav technology] and outright stated that he didn't believe him: 'I do not believe that what you say you have done, was done. It is not scientifically possible to produce 20 cubic meters of steam per hour from 10KW of energy.'

30. In contrast to his seeming candor with a family member, Swanson withheld this information about Energy Company A from other investors and prospective investors, instead

stating, in a March 9, 2014 email about a demonstration attended on March 7, 2014 by Energy Company A's Engineer, "[e]verything went perfectly."

31. By July 2014, Swanson had further inflated his false story of Energy Company A's interest in SonCav, boasting that Energy Company A now sought a 12% share of the company for an investment of $10 million and a purchase of 30 "water units." This story had no basis in fact, as Swanson knew at the time. In fact, in a November 2014 email to another SonCav employee, Swanson admitted as much, writing "I haven't heard anything from him regarding contacts at [Energy Company A] for actual sales (Unit leasing)."

32. Swanson continued to misrepresent Energy Company A's interest in SonCav's technology through mid-2015. Among other instances, in April 2015, Swanson falsely told investors that Energy Company A planned to attend a second demonstration of SonCav's technology. In actuality, Swanson understood that Energy Company A's employees were unwilling to spend any more time on SonCav unless and until SonCav provided Energy Company A staff with test data proving that the technology worked.

33. Further, in several April 2015 emails, Swanson invited investors and prospective investors to a May 2015 demonstration of SonCav's liquid purification technology. In those emails, Swanson fraudulently suggested that a representative of Energy Company A would be attending by providing a list of attendees, which falsely identified the middleman that SonCav had engaged to introduce SonCav to Energy Company A. Specifically, the list identified the middleman as "representing [Energy Company A]." In fact, as Swanson well knew, the middleman was under contract with, and represented, SonCav – not Energy Company A.

34. By May 2015, Swanson added to his misrepresentations about outside interest in SonCav, claiming to investors and potential investors that another major oil and gas company,

10

Energy Company B, had "entered the list of suitors" for liquid purification units from SonCav. Swanson further claimed that Energy Company B's interest had not been solicited by SonCav, and "they reached out to us." Swanson knew both of these claims were false.

35.     Swanson also misrepresented SonCav's supposed partnership with a third company, a water technology company that built many of the components that SonCav planned to use to build its product. Beginning in early 2014, Swanson falsely told investors and prospective investors that this water technology company would supply, for free, all the components SonCav needed to build a "field testing unit" as well as provide free engineering services for both the field testing unit and a "demo-data testing unit." Swanson knew these statements were false when he made them—no such commitments had been made by the water technology company.

**Misrepresentations about SonCav's Technology**

36.     Between November 2013 and July 2014, Swanson made false and misleading representations to actual and potential investors regarding SonCav's technology. In order to induce investors and prospective investors to provide funding to SonCav, Swanson represented to investors that the same technology as SonCav's had been used for years in a practical setting in Russia, providing all fuel needs for a major chemical plant as well as for military aircraft at a nearby base. Swanson represented SonCav's business simply required it to replicate what had already been done in Russia. Swanson also led the investors and potential investors to believe that they were investing in a technology that had operated in Russia, but whose functionality had been independently verified by a San Antonio, Texas based research and development organization (the "Institute"). Swanson described the Institute to investors as "a well-known and respected player in the [oil and gas] industry." In reality, although the Russian inventor of the

technology was a principal of SonCav's parent company, Swanson had no basis in fact to claim that the technology had actually been used in a practical setting in Russia, and knew, or was reckless in not knowing, that the Institute had failed to conclude that it worked in the way Swanson had claimed.  At all times relevant to this Complaint, Swanson had a report authored by the Institute's scientist who had observed the so-called technology only in a laboratory setting in Russia.  The report stated that the author had conducted testing on samples collected, and had concluded that the technology did not work as claimed.

37. In a document emailed to numerous investors and prospective investors between March 2014 and March 2015, Swanson made the following representations, which were directly contradicted by the Institute report that he had in his possession:

- ". . . the technology has been in use for years in Russia, with such use independently verified by [the Institute] . . ."
- "[the Institute] … tested and confirmed feedstock (Western Siberian Crude) to product (diesel) from one of our Russian Units."

38. Swanson also made misleading claims to investors about the viability of SonCav's technology, such as:  "At full capacity, units can be assembled in 8 hours" and, "100% of recovered water can be re-used, eliminating all disposal issues."  Swanson's misleading claims also falsely detailed the yields of the technology (such as pure water, jet fuel, and diesel fuel), the throughput of the machine (barrels/gallons of water or oil purified per day), and the field testing experience of the technology in Russia.  Such claims were highly misleading, since SonCav had never produced a working and fully functional prototype.  Nor had a working and fully functional prototype of SonCav's liquid purification technology been independently tested and verified.

**Misrepresentations about the Terms and Risk of the SonCav Securities**

39. In order to induce prospective investors to invest in SonCav, Swanson frequently lulled prospective investors into believing their investments would be safer than they were. For example, in spring and summer 2015, Swanson and SonCav made an unconditional promise to pay 120 percent of an investor's loan within the year. In actuality, as Swanson well knew, SonCav was not in a financial position to make any such payments.

40. Swanson convinced prospective investors to enter into a convertible loan agreement which explicitly gave them the right to receive back their principal (i.e., their capital contribution) plus interest at the end of the loan term.

41. Swanson told investors and prospective investors that the principal of their investments was protected because that principal was secured by shares of a public company that could be sold. Between September 2012 and June 2013, for instance, Swanson made this representation to an investor ("Investor A") who subsequently invested $130,000 as part of a joint venture that advanced a $500,000 convertible bridge loan to SonCav.

42. Swanson also repeatedly misled Investor A, who tried to call in his loan, instead of converting his equity option. Starting in spring 2014, at the time the investor was considering whether to convert his loan to equity in SonCav or withdraw his principal, Swanson told the investor that he was protected from losing all of his principal, and that he could redeem his investment through a simple 30-day redemption process.

43. Between approximately May 2014 and July 2014, Swanson kept changing the terms and processes Investor A would need to comply with in order to withdraw his money. In May 2014, Swanson said he needed thirty-days' notice, and told Investor A that to receive his money the limited liability company would have to sell the publicly traded stock Swanson had

previously touted as protection for the investments. At the same time, Swanson misrepresented to Investor A that the submission of data to Energy Company A, and thus the consummation of a deal with Energy Company A, was just a couple of months away.

44. By July 18, 2014, however, Swanson was telling a different story about cashing out investments. He now told Investor A that there had previously not been terms in place governing the withdrawal of investor funds, but that SonCav had now established new ones. He told Investor A that SonCav had seventy-five days to pay back the loans, falsely stating, "we set it at 75 days to coincide with [component company's] expectations of readiness to conduct field testing." He then added two more weeks for the sale of the publicly-traded stock that was supposed to back the investment, and concluded that SonCav had "three months" to pay back the investor.

45. A week later, Swanson told Investor A that SonCav could not pay the note, and admitted that the previously-touted publicly-traded stock, which was supposedly in place to protect the group of investors with whom Investor A had invested, could not cover the value of the investment. On August 18, 2014, Swanson told Investor A that the stock in question could not be sold without a release and unanimous consent of all other investors with whom Investor A had invested, and reiterated the seventy-five day "requirement."

46. In September 2014, in a ploy to further delay and frustrate Investor A's attempt to redeem his money, Swanson told him that he was "withdrawing" from the process of Investor A trying to recover his money because of Swanson's "conflict of interest." Swanson also refused to answer Investor A's inquiry about the use of investor funds by the company, telling him "as long as the company funds went to SonCav … then you're done, no?"

47. From December 2013 through June 2015, while he was making these misrepresentations to Investor A and other investors and prospective investors, Swanson used new investor funds to pay back family members for loans those family members had made to SonCav. Even though SonCav had no revenue, between May 2014 and June 2015 Swanson used new investor funds to pay his cousin principal and interest totaling $32,750 on a $10,000 loan (at a rate of 150% annum). During the same time period, Swanson also caused SonCav to make loan payments to his father.

## First Claim for Relief
### (Violation of Section 17(a) of Securities Act)

48. The Commission repeats and incorporates by reference the allegations in paragraphs 1 through 47 above as if set forth fully herein.

49. By reason of the foregoing, Swanson, directly or indirectly, acting intentionally, knowingly or recklessly, by use of the means or instruments of transportation or communication in interstate commerce or by the use of the mails, in the offer or sale of securities: (a) employed devices, schemes, or artifices to defraud; (b) obtained money or property by means of untrue statements of material fact or omissions to state a material fact necessary to make the statements not misleading; or (c) engaged in transactions, practices, or courses of business which operated as a fraud or deceit upon the purchasers of such securities.

50. By engaging in the conduct described above, Swanson has violated, and unless enjoined will continue to violate, Section 17(a) of the Securities Act [15 U.S.C. §77q(a)].

## Second Claim for Relief
### (Violation of Section 10(b) of Exchange Act and Rule 10b-5)

51. The Commission repeats and incorporates by reference the allegations in paragraphs 1 through 50 above as if set forth fully herein.

52. By reason of the foregoing, Swanson, directly or indirectly, acting intentionally, knowingly or recklessly, in connection with the purchase or sale of securities, by use of the means or instrumentalities of interstate commerce or the facilities of a national securities exchange or the mail: (a) employed devices, schemes, or artifices to defraud; (b) made untrue statements of material fact or omitted to state material fact(s) necessary to make the statements made not misleading; or (c) engaged in acts, practices, or courses of business which operated as a fraud or deceit upon certain persons.

53. By engaging in the conduct described above, Swanson has violated, and unless enjoined will continue to violate, Section 10(b) of the Exchange Act [15 U.S.C. §78j(b)] and Rule 10b-5 thereunder [17 C.F.R. §240.10b-5].

## **PRAYER FOR RELIEF**

WHEREFORE, the Commission requests that this Court:

A. Enter a permanent injunction restraining Swanson and each of his agents, servants, employees and attorneys and those persons in active concert or participation with him who receive actual notice of the injunction by personal service or otherwise, including facsimile transmission or overnight delivery service, from directly or indirectly engaging in the conduct described above, or in conduct of similar purport and effect, in violation of Section 17(a) of the Securities Act [15 U.S.C. § 77q(a)], and Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5];

B. Prohibit Swanson, pursuant to Section 20(e) of the Securities Act [15 U.S.C. § 77t(e)] and Section 21(d)(2) of the Exchange Act [15 U.S.C. § 78u(d)(2)], from acting as an officer or director of any issuer that has a class of securities registered under Section 12 of the Exchange Act [15 U.S.C. § 78l] or that is required to file reports under Section 15(d) of the

Exchange Act [15 U.S.C. § 78o];

 C. Require Swanson to disgorge his ill-gotten gains, plus pre-judgment interest, for the applicable five-year statutory limitation period;

 D. Require Swanson to pay appropriate civil monetary penalties pursuant to Section 20(d) of the Securities Act [15 U.S.C. § 77t(d)] and Section 21(d)(3) of the Securities Exchange Act [15 U.S.C. § 78u(d)(3)];

 E. Retain jurisdiction over this action to implement and carry out the terms of all orders and decrees that may be entered; and

 F. Grant such other and further relief as the Court deems just and proper.

## JURY DEMAND

The Commission hereby demands a trial by jury on all claims so triable.

Respectfully submitted,
/s/ Rua M. Kelly
Rua M. Kelly (Mass. Bar No. 643351)
Marc J. Jones (Mass. Bar No. 645910)
Dawn Edick (Mass. Bar No. 641659)
Amy Gwiazda (Mass Bar No. 663494)
33 Arch Street, 24th Floor
Boston, Massachusetts 02110
Telephone: (617) 573-8941 (Kelly direct)
Facsimile: (617) 573-4590
E-mail: KellyRu@sec.gov

Attorneys for Plaintiff
U.S. SECURITIES AND EXCHANGE COMMISSION

Dated: May 14, 2020